# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

**ZACHARY DEAN COBB**,

Petitioner,

v.

**ANGELA HEARRELL**,[1]

Respondent.                                      **Case No. 19-CV-199-RAW-KEW**

## OPINION AND ORDER

This action is before the Court on Zachary Dean Cobb's 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus (Dkt. 2). Cobb is an Oklahoma prisoner currently incarcerated at the Lawton Community Corrections Center in Lawton, Oklahoma. He brings this action to attack the judgment entered against him in Wagoner County District Court Case No. CF-2012-244 and identifies three claims for relief:

I.    Ineffective assistance of appellate counsel;
II.   Ineffective assistance of trial counsel; and
III.  Cumulative Error.

Dkt. 2 at 7-23.

---

[1] According to the offender website maintained by the Oklahoma Department of Corrections (okoffender.doc.ok.gov), Cobb is currently incarcerated at the Lawton Community Corrections Center (LCCC) in Lawton, Oklahoma. The Court therefore substitutes the LCCC facility administrator, Angela Hearrell, in place of Jimmy Martin as party respondent. Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note this substitution on the record.

Respondent concedes, and the Court finds, that Cobb timely filed the habeas petition, according to the one-year statute of limitations in 28 U.S.C. § 2244(d)(1). Dkt. 20 at 2. Respondent also concedes that Cobb has exhausted claims one and two, as required by 28 U.S.C. § 2254(b)(1)(A), but argues claim three is unexhausted. *Id*. at 2, 74-75. The following records have been submitted to the Court for consideration in this matter:

A. Cobb's charging information. Dkt. 2-1.

B. Cobb's judgment and sentence. Dkt. 2-2.

C. Cobb's direct appeal brief. Dkt. 20-1.

D. The State's brief in Cobb's direct appeal. Dkt. 20-3.

E. Cobb's application to supplement the direct appeal record. Dkt. 20-2.

F. Opinion affirming Cobb's judgment and sentence. *Cobb v. State*, No. F-2014-1062 (Okla. Crim. App. Feb. 10, 2016) (unpublished). Dkt. 20-4.

G. Cobb's application for post-conviction relief, filed in *Cobb v. State*, No. CF-2012-244 (Wagoner Cnty. Dist. Ct.) on Feb. 14, 2017. Dkt. 20-5.

H. Cobb's brief in support of his application for post-conviction relief. Dkts. 20-6, 20-7.

I. The State's response to Cobb's application for post-conviction relief. Dkt. 20-8.

J. Order denying application for post-conviction relief, filed in Case No. CF-2012-244 on November 26, 2018. Dkt. 2-4.

K. Cobb's supplemental brief on post-conviction appeal, filed in Case No. PC-2017-1273 (Okla. Crim. App.). Dkt. 20-9.

L. Order affirming denial of application for post-conviction relief, filed in *Cobb v. State*, No. PC-2017-1273 (Okla. Crim. App. Apr. 3, 2019) (unpublished). Dkt. 20-10.

M. Affidavit of Zachary Cobb. Dkt. 2-6.

N. Affidavit of Noel Cobb. Dkt. 2-7.

O. Affidavit of Kim Hart. Dkt. 2-8.

P. Affidavit of Terry J. Hull. Dkt. 2-9.

Q.  Affidavit of Thomas W. Young, MD.  Dkt. 2-10.

R.  Affidavit of Gordon W. Bulla.  Dkt. 2-11.

S.  SouthCrest Hospital OB Assessment.  Dkt. 2-12.

T.  Clinical visit for L.C., son of Cobb.  Dkt. 2-13.

U.  Neuropathology of infant subdural hemorrhage (SDH) by Waney Squier and Julie Mack.  Dkt. 2-14.

V.  SDH, intradural hemorrhage and hypoxia in the pediatric and perinatal postmortem by Marta Cohen, Alan Sprigg, and Elspeth Whitby.  Dkt. 2-15.

W.  Evaluation and management of apparent life-threatening events in children by Karen Hall and Barry Zalman.  Dkt. 2-16.

X.  Non-traumatic intradural and SDH and hypoxic ischemic encephalopathy in fetuses by Irene Scheimberg, et al.  Dkt. 2-17.

Y.  Affidavit of Jonathan Lipman.  Dkt. 2-18.

Z.  Transcripts and Original Record.  Dkt. 21.

## I.   PROCEDURAL BACKGROUND

On June 18, 2012, the State of Oklahoma charged Cobb, in the District Court of Wagoner County, Case No. CF-2012-244, with one count of child abuse by injury.  Dkt. 21-17 at 13.[2] Cobb's case proceeded to trial and, on October 31, 2014, a Wagoner County jury found Cobb guilty of child abuse by injury and recommended 30 years' incarceration.  Dkt. 21-18 at 78.  The Court sentenced Cobb accordingly.  *Id*. at 82.

Cobb directly appealed his judgment and sentence to the Oklahoma Court of Criminal Appeals (OCCA).  Dkt. 20-1.  The OCCA reviewed Cobb's claims and, on February 10, 2016,

---

[2] For consistency, the Court's citations refer to the CM/ECF header pagination.  However, for citations to transcripts of state court proceedings, the Court also provides original page numbers in parentheses.

affirmed the trial court's judgment and sentence in *Cobb v. State*, No. F-2014-1062 (Okla. Crim. App. Feb. 10, 2016) (unpublished) (Dkt. 20-4).[3]

On February 14, 2017, Cobb filed an application for post-conviction relief. Dkt. 20-5. The trial court denied Cobb's application on November 20, 2018. Dkt. 2-4. Cobb filed a postconviction appeal and, on April 3, 2019, the OCCA affirmed the denial of postconviction relief in *Cobb v. State*, No. PC-2017-1273 (Okla. Crim. App. Apr. 3, 2019) (unpublished) (Dkt. 20-10). Cobb filed the instant habeas petition on June 25, 2019.

## II.   FACTUAL BACKGROUND

The jury convicted Cobb of abusing his infant son, L.C., who now suffers from a "life long devastating brain injury." Dkt. 21-10 at 35 (462). Before May 22, 2012, L.C. was living with his father, Cobb; his mother, Bessie Bruno;[4] two older siblings, P.C. and A.B.; Cobb's grandfather, Noel Cobb; and Noel Cobb's girlfriend, Jannette Collins.[5] Dkt. 21-8 at 61 (308). Bruno was L.C.'s primary caretaker. *Id*. at 63-64 (310-11). On May 17, 2012, Bruno was arrested for shoplifting and was jailed. Dkt. 21-9 at 39 (358). Bruno had a criminal history that primarily included drug-related felony warrants and a failed attempt at drug court. *Id*. at 83, 85 (402, 404). As a result of Bruno's arrest, Cobb became L.C.'s primary caretaker. Dkt. 21-9 at 39-40 (358-59).

On the morning of May 22, 2012, around 6:00 a.m., Collins and Noel Cobb were awakened by knocking on their bedroom door. Dkt. 21-8 at 69 (316). Collins testified that she saw Cobb

---

[3] The Court notes that the OCCA remanded Cobb's case for an evidentiary hearing regarding a plea offer that was not conveyed. Dkt. 20-4 at 3. That issue is not raised in this habeas proceeding.

[4] Bessie Bruno, the mother of L.C., is also referred to as B.B., Isabella or Izzie. Dkt. 21-9 at 34-35 (353-54); Dkt. 2 at 4.

[5] To avoid confusion, the Court refers to Zachary Cobb as "Cobb" and refers to Noel Cobb by his first and last name.

performing CPR on L.C. on the floor in a little pantry area outside Noel Cobb's bedroom. *Id*. at 69-70 (316-17). Cobb told Collins that he was feeding L.C. a bottle, and that L.C. had started choking, so he began CPR. *Id*. Collins felt around L.C.'s mouth and throat but could not feeling anything. *Id*. at 71 (318). Collins testified that Cobb stated "oh my God, I've killed my son" several times. Dkt. 21-9 at 1 (320).

During this time, Noel Cobb called 911. Dkt. 21-8 at 71 (318). Fire department medics, Terry Disler and her husband, Doug Disler, were the first to arrive on scene around 7:00 a.m. Dkt. 21-11 at 50-54 (557-61); Dkt. 21-12 at 78 (665). Terry Disler performed back thrusts in an attempt to dislodge any object blocking L.C.'s airway, as she was told L.C. was choking. Dkt. 21-11 at 56-57 (563-64). L.C. expelled a liquid, that "seemed like formula," but was still not breathing well. *Id*. at 58-59 (565-66). Doug Disler then took L.C. to obtain vitals. Dkt. 21-12 at 86-87 (673-74). He noticed that L.C.'s eyes were fixed, which he testified is a sign of a brain injury. *Id*. at 88-90 (675-77). He also noticed bruising on the side and back of L.C.'s head and observed the bruising on the side of the head get darker over time. *Id*. at 91, 104-107 (678, 691-94).

Wagoner EMS paramedics Kyle Murphy and Jana Metzger took over care when they arrived. Dkt. 21-13 at 16-18, 40 (715-17, 739). Murphy attempted to suction L.C.'s airway but very little was recovered. *Id*. at 21 (720). Murphy then ventilated the baby "with ease," indicating there was no obstruction of the airway. *Id*. He saw that L.C. had a "dysconjugate gaze," which "is usually indicative of a head bleed"; was "posturing," which Murphy described as having an involuntary reflex of the arms and wrists indicative of a head injury; and had a clenched jaw, which also is indicative of a head injury. *Id*. at 22-26 (721-25). Murphy testified that these symptoms, along with bruising he saw on L.C.'s head, were consistent with a significant head injury rather than choking. Dkt. 21-13 at 22-26 (721-25).

5

Paramedics took L.C. to the Wagoner Community Hospital and arranged for a helicopter to transport him to the pediatric intensive care unit (PICU) at Saint Francis Hospital due to his critical condition. Dkt. 21-10 at 23 (450); Dkt. 21-13 at 42-43 (741-42). Dr. Nicole Wallace, a child abuse pediatrician, observed L.C. in the PICU on May 22, 2012. Dkt. 21-10 at 11, 23 (438, 450). She testified that L.C. was on a mechanical ventilator, was not responsive, and had bruises on both sides of his head and on his face, chin, ear, and toe. *Id*. at 23-24 (450-51).

A CT scan of L.C.'s head was performed and revealed a substantial subdural hemorrhage (SDH) that required emergency surgery to relieve the pressure on his brain. Dkt. 21-10 at 23-25 (450-52). Unfortunately, the blood reaccumulated and L.C. had to undergo a second, more invasive surgery to try to stop the bleeding. *Id*. at 26 (453). Dr. Wallace testified that the rapid pace of the reaccumulation of blood in L.C.'s brain indicated his injury was hours old, not days or weeks old. *Id*. at 26-27 (453-54).

Dr. Dan Boedeker, a neurosurgeon, performed the two surgeries. Dkt. 21-11 at 39 (545-46). During the first surgery, Dr. Boedeker observed old blood in L.C.'s brain, and during the second surgery he identified a torn bridging vein that was hemorrhaging. *Id*. at 39-40 (546-47). Dr. Boedeker testified that the torn bridging vein was generally consistent with trauma. *Id*. at 41 (548).

Dr. Stephen Groves, a pediatric ophthalmologist, examined L.C. on May 24, 2012. Dkt. 21-12 at 10-11, 17 (597-98, 604). Dr. Groves observed approximately 80 to 100 multi-layer hemorrhages in L.C.'s left eye and approximately 20 single-layer hemorrhages in his right eye. *Id*. at 21 (608). Dr. Groves testified that retinal hemorrhages are "fairly specific" with a shaking mechanism. *Id*. at 30 (619). He also testified about the amount of force required to cause the retinal hemorrhages, stating, "We don't know." *Id.* at 38 (627). Dr. Groves opined, however, that

6

"if someone saw [the application of force] happening it would be obvious that there was purposeful and very strong shaking going on." *Id*. Dr. Groves examined L.C. again on June 13, 2012. *Id*. at 34 (621). L.C.'s right eye was clear of retinal hemorrhages, and his left eye was clear except for three larger ones. *Id*. at 35 (622). This healing led Dr. Groves's to conclude that the hemorrhages were fresh at the time of his initial examination. *Id*. at 34, 37-40 (621, 624-27).

Given L.C.'s injuries, Dr. Wallace opined that L.C. suffered from "abusive head trauma." Dkt. 21-10 at 32 (459). Dr. Wallace explained that this was not the type of trauma seen in everyday interactions with a child, and based upon her examination of L.C., that his injuries were not caused by anything other than abusive head trauma. *Id*. at 32, 39 (459, 466). L.C. was hospitalized for almost a month, and it is believed he will suffer from a lifelong brain injury. *Id*. at 34-35 (461-62).

## III.    STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), federal habeas corpus relief is proper only when the state court's adjudication of a federal claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Cobb argues throughout his brief that the Court should review certain claims de novo, rather than under the AEDPA, because the OCCA did not address the merits of his claims. Dkt. 14 at 19, 34, 37, 45. Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion "does not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Section "2254(d)

7

does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  *Id*. at 100; *see also Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) (finding deference is owed to the state court's result even if its reasoning is not expressly stated).  Moreover, this Court's review is "limited to examining whether the highest state court's resolution of a particular claim is contrary to, or an unreasonable application of, clearly established federal law."  *Alverson v. Workman*, 595 F.3d 1142, 1155 (10th Cir. 2010).

Here, Cobb presented his ineffective assistance of trial and appellate counsel claims (claims one and two) to Oklahoma's highest court, the OCCA.  *See* Dkt. 2-1; Dkt. 20-6; Dkt. 20-7.  The OCCA reviewed these claims on the merits and while its holdings are limited to a sentence or two, this satisfies the requirements of a merits ruling.  *Richter*, 562 U.S. 98; Dkt. 20-4 at 3 ("After review of all of Appellant's [ineffective assistance of trial counsel claims], we find no reasonable probability of a different outcome from any of the allegedly deficient acts or omissions of counsel."); Dkt. 20-10 at 4 ("The appeal record does not support the claim that [appellate] counsel's performance was either deficient or resulted in prejudice.").  Accordingly, the Court finds claims one and two are exhausted, and the OCCA's decisions as to those claims are entitled to deference under the AEDPA.[6]

## IV.    INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In claim one, Cobb contends his appellate counsel was ineffective, in violation of the Sixth Amendment, for failing to argue that trial counsel was ineffective for five reasons (sub-claims A through E) and for failing to raise two *Brady*[7] claims (sub-claim F).  Dkt. 14 at 3.

---

[6] The Court does not reach a conclusion on the exhaustion of Cobb's cumulative-error claim (claim three), but rather chooses to address the merits of this claim pursuant to 28 U.S.C. § 2254(b)(2).

[7] *Brady v. Maryland*, 373 U.S. 83 (1963)

To prevail on a claim of ineffective assistance of appellate counsel, a prisoner has the burden of showing his counsel was deficient and that such deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). Generally, this means that a prisoner must show that appellate counsel performed deficiently by inadequately presenting or by omitting certain claims from the prisoner's direct appeal. *See Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003) (explaining that "ineffective appellate assistance can be established on the basis of the demonstrable merit of the issue omitted by counsel on the petitioner's direct appeal"). Thus, a reviewing court ordinarily must consider the merits of the issues a petitioner claims were omitted or inadequately raised. *Id.* at 1202-03. But, as with any *Strickland* claim, a reviewing court's "scrutiny of counsel's performance must be highly deferential," and the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Even if counsel's performance is shown to be unreasonable under this deferential standard, *Strickland* requires the defendant to show prejudice, *i.e.*, to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. *Strickland* requires the reviewing court to view counsel's performance with great deference. *Id.* at 689.

Section 2254(d) adds a second layer of deference.[8] Thus, when a federal habeas court reviews a state court's decision on a *Strickland* claim, the habeas court must grant the state court

---

[8] Cobb requests an evidentiary hearing as to claim one. Dkt. 14 at 22-23. Because the OCCA adjudicated this claim on the merits, this Court's review of claim one is limited to the existing state-court record unless Cobb can show that § 2254(d) does not bar relief. *See Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."); 28 U.S.C. § 2254(d)(2) (requiring reviewing court to consider reasonableness of state court's factual determination "in light of the evidence presented in the State court proceeding"). And, for the reasons that follow, he cannot make that showing. The Court therefore denies Cobb's request for an evidentiary hearing.

"a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101. The only question for the habeas court is whether the state court had a reasonable basis for rejecting the *Strickland* claim. *Id.* at 105. "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.*

Cobb presented his ineffective-assistance-of-appellate-counsel claim to the OCCA through his post-conviction appeal, and the OCCA rejected it. *Cobb*, No. CF-2012-244 (Dkt. 20-5); *Cobb*, No. PC-2017-1273 (Dkt. 20-6; Dkt. 20-7). The OCCA found the trial court appropriately denied postconviction relief after the trial court "looked to the merits of the issues raised and concluded that appellate counsel's performance was not deficient." Dkt. 20-10 at 4. The OCCA agreed with the trial court that "[t]he record does not support the claim that counsel's performance was either deficient or resulted in prejudice." *Id.*

## A. FAILURE TO RAISE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIM RELATED TO FAILURE TO PRESENT MEDICAL EXPERT

Cobb first argues appellate counsel should have argued that trial counsel was ineffective for failing to adequately investigate the cause of L.C.'s injuries and present expert testimony to counter the State's causation evidence. Dkt. 2 at 7-10. To support this argument, Cobb presents several affidavits, including one from Dr. Thomas Young, scholarly articles on SDH and Hereditary Hemorrhagic Telangiectasia (HHT),[9] and medical records. Dkts. 2-6, 2-7, 2-8, 2-9, 2-

---

[9] According to the Centers for Disease Control and Prevention (CDC):

> HHT is a disorder in which some blood vessels do not develop properly. A person with HHT may form blood vessels without the capillaries (tiny blood vessels that pass blood from arteries to veins) that are usually present between arteries and veins. The space between an artery and a vein is often fragile and can burst and bleed much more easily than other blood vessels. Men, women, and children from all racial and ethnic groups can be affected by HHT and experience the problems associated with this disorder, some of which are serious and potentially life-threatening.

10, 2-12, 2-13, 2-14, 2-15, 2-16, 2-17.  Cobb also contends that, while his trial counsel did hire a consulting expert, Kim Hart, on this matter, trial counsel did not hire any expert recommended by Hart.  Dkt. 14 at 12.  He states that trial counsel filed several motions for continuance to find an expert, and argues that these motions support his view that trial counsel's performance in failing to present an expert witness was deficient and prejudicial.  *Id*. at 12-13.

Respondent argues that the OCCA's decision regarding appellate counsel's omission of this sub-claim was reasonable because the choice of calling an expert witness was a matter of trial strategy.  Dkt. 20 at 18-20.  Respondent also contends that Cobb's appellate counsel investigated this sub-claim and found it had no merit, in part, because Cobb's trial counsel had extensive experience trying child abuse cases and because of Hart's report.  *Id*. at 21-22.

As previously stated, Cobb primarily relies on Dr. Young's opinion—that L.C. could have developed SDH and retinal hemorrhages *via* hypoxia rather than trauma—to support his allegation that appellate counsel was ineffective for failing to argue that trial counsel failed to adequately investigate the cause of L.C.'s injuries and failed to adequately counter the State's causation evidence by presenting an expert witness.  Dkt. 2-10 at 2-4; Dkt. 14 at 11-19.  Dr. Young concluded, based on his review of trial testimony, medical records, and Cobb's account of L.C. choking and not breathing, that L.C.'s injuries "could have happened" without trauma.  Dkt. 2-10

---

Centers for Disease Control and Prevention, *Facts About Hereditary Hemorrhagic Telangiectasia (HHT)*, https://www.cdc.gov/ncbddd/hht/index.html (Apr. 27, 2022).  The CDC also states that HHT can be diagnosed either through genetic testing or by using clinical criteria.  *Id*.  This criteria includes a family history, nose bleeds (epistaxis), and pink or red lines on the skin when pressed (telangiectasias), among others.  C. L. Shovlin, A. E. Guttmacher, E. Buscarini, M. E. Faughnan, R. H. Hyland, C. J. Westerman, A. D. Kjeldsen, and H. Plauchu, *Diagnostic Criteria for hereditary hemorrhagic telangiectasia (Rendu-Osler-Weber syndrome)*, American Journal of Medical Genetics, https://pubmed.ncbi.nlm.nih.gov/10751092 (Mar. 2000).  Complications from HHT can vary widely and depend on the parts of the body that are affected by HHT.  Centers for Disease Control and Prevention, *Facts About Hereditary Hemorrhagic Telangiectasia (HHT)*, https://www.cdc.gov/ncbddd/hht/index.html (Apr. 27, 2022).

at 3.  Dr. Young also concluded that L.C.'s continued (or secondary SDH) was likely caused during the first brain surgery performed when Dr. Boedecker "tor[e] the bridging vein."  *Id*. at 6 ("Dr. Boedecker chose to blame abusive head trauma rather than admit that the first neurosurgical procedure could have torn the bridging vein.").

The record, however, contains ample evidence and testimony from numerous medical providers that L.C.'s injuries likely were caused by trauma.  There is no doubt that L.C. suffered from low oxygen during the relevant course of events.  But Dr. Young's conclusion that L.C.'s lack of oxygen was caused by choking is contradicted by the record.  Several first responders concluded L.C.'s condition was not due to choking.  This was because first responders did not locate any foreign object in L.C.'s airway sufficient to inhibit breathing, were able to intubate L.C. (an indication there was no obstruction of the airway) and found bruising on L.C.'s head that darkened during their observation.  Dkt. 21-11 at 56-57 (563-64); Dkt. 21-12 at 91, 105-107, 109 (678, 692-94, 696).  Moreover, L.C.'s eyes were fixed, L.C. was "posturing"–an involuntary reflex of the arms and wrists–L.C.'s jaw was clenched, and L.C. was not crying.  Dkt. 21-12 at 88-90 (675-77); Dkt. 21-13 at 23-26 (722-25).  Testimony indicated each of these is a symptom of traumatic brain injury.  Dkt. 21-12 at 88-90 (675-77); Dkt. 21-13 at 22-23 (722-23).

More importantly, the record shows that appellate counsel thoroughly investigated this issue and made a strategic decision not to argue that trial counsel was ineffective for failing to present an expert witness to testify that L.C.'s injuries may have resulted from choking rather than trauma.  Appellate counsel, via affidavit, states in relevant part:

> In Mr. Cobb's direct appeal, I did not challenge [trial counsel's] failure to call an expert witness regarding shaken baby syndrome.  I reviewed the evidence presented at Mr. Cobb's trial, the criminal discovery [trial counsel] had while preparing for trial, and the written review/analysis of both this discovery and medical information by an expert whom [trial counsel] did engage while preparing for trial.  Viewed together and in light of the circumstances extant at the time of trial, I concluded I

could not show both (1) that [trial counsel's] failure to call such an expert witness fell below an objective standard of reasonableness under prevailing professional norms and could not be considered reasonable strategy in the particulars of the case and (2) that there is a reasonable probability that the result of Mr. Cobb's trial would have been different had such an expert witness been called.  These showings I was required to make under *Strickland v. Washington*, 466 U.S. 688.

\* \* \*

My review of Ms. Hart's review/analysis of criminal discovery and medical and birth records revealed that the foundation of an expert defense to the charge against Mr. Cobb first required that Mr. Cobb explain how the documented injuries occurred, as [L.C.] was approximately five and one-half months old and could not have inflicted the multiple injuries to himself.  Uncontested evidence revealed that Mr. Cobb was the sole caretaker for his son [L.C.] from May 17, 2012, when Mr. Cobb's wife was arrested and incarcerated in county jail, until May 22, 2012, the day-of-incident and during which Mr. Cobb's wife was still incarcerated.  Upon [trial counsel's] advice, Mr. Cobb made the decision to not testify.

Dkt. 2-9 at 1-3.

As Respondent argues, strategic choices made by trial or appellate counsel after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.  And selecting "an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that" is "virtually unchallengeable" after trial counsel has made a "thorough investigation of [the] law and facts."  *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (alterations in original) (quoting *Strickland*, 466 U.S. at 690); *see also Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) (explaining that "the decision of which witnesses to call is quintessentially a matter of trial strategy for the trial attorney.").  In the instant case, the record shows that appellate counsel sufficiently investigated trial counsel's strategic decision to not present expert testimony on medical causation.  Appellate counsel spoke to Cobb's trial counsel, reviewed the record, and reviewed Hart's report.  Because Cobb's appellate counsel performed a thorough investigation into this sub-claim, and trial counsel's strategic decision to call—or to not call—an expert witness is "virtually unchallengeable" after a thorough investigation, *Strickland*,

466 U.S. at 690, the Court finds the OCCA's decision that appellate counsel's omission of this sub-claim was neither deficient nor prejudicial was not based on an unreasonable application of *Strickland*.  28 U.S.C. § 2254(d)(1).

## B. FAILURE TO RAISE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIM RELATED TO TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND IMPEACH BESSIE BRUNO

Next, Cobb claims his appellate counsel should have argued that trial counsel performed deficiently and prejudicially by failing to adequately cross-examine and impeach Bruno regarding crimes of dishonesty.  Dkt. 2 at 10-11.  Cobb alleges that about one month before trial Bruno fraudulently used her mother's credit card in Florida (where Bruno was living with her parents) and initially lied about her involvement when the fraudulent charges were reported to the police. *Id*. at 11.  Cobb argues trial counsel should have impeached Bruno with this information and, had trial counsel done so, the jury would have found "she has a pertinent character trait to fabricate elaborate stories" and blame others for her crimes.  *Id*.

Respondent contends it was reasonable for the OCCA to find that appellate counsel was not ineffective for omitting this argument because trial counsel's performance on this issue was neither deficient nor prejudicial.  Dkt. 20 at 29-34.  The Court agrees.

The Tenth Circuit has held "the manner in which counsel cross-examines a particular witness is a strategic choice and therefore 'virtually unchallengeable.'"  *Kessler v. Cline*, 335 F. App'x 768, 770 (10th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690) (unpublished).[10]  Here, the record reflects that on September 11, 2014, Bruno was arrested for petit theft and illegal use of

---

[10] The Court cites *Kessler*, and other unpublished decisions herein, as persuasive authority.  *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

credit cards. Dkt. 2-11. Cobb provides no evidence showing Bruno was convicted of this crime; rather, he provides only evidence that she was charged. *Id.* Under Oklahoma law, "[e]vidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement." Okla. Stat. tit. 12, § 2609(2). Even assuming the trial court had permitted trial counsel to impeach Bruno with evidence that she had been charge, but not convicted, of crimes in Florida, the value of impeaching Bruno with this information appears de minimis. Cobb's trial counsel cross-examined Bruno about her prior criminal history, including her arrest and conviction in Oklahoma for theft, her attempts to escape jail after arrest, and her multiple felony warrants. Dkt. 21-9 at 59-65 (378-84). Trial counsel also cross-examined Bruno on her drug use, her failed attempt at drug court, her written statements made in drug court about her dishonesty with family and friends, and her suspected drug use while at the hospital with L.C. *Id.* at 85-98 (404-17). This cross-examination was more than sufficient to raise questions about Bruno's reliability, credibility, and truthfulness. Any further questions about Ms. Bruno's criminal history would have been needlessly cumulative.

On the record presented, reasonable jurists could not find trial counsel's cross-examination was objectively unreasonable so as to violate the Sixth Amendment. The Court therefore finds the OCCA reasonably applied *Strickland* when it concluded that appellate counsel's performance in failing to argue trial counsel's ineffectiveness on this point was not deficient or prejudicial.

## C. FAILURE TO RAISE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL RELATED TO TRIAL COUNSEL'S FAILURE TO ESTABLISH THAT BRUNO WAS DIAGNOSED WITH HEREDITARY HEMORRHAGIC TELANGIECTASIA (HHT)

Cobb argues his appellate counsel was ineffective for failing to argue that trial counsel failed to investigate and determine whether Bruno had been diagnosed with Hereditary

15

Hemorrhagic Telangiectasia (HHT). Dkt. 14 at 30. Cobb argues trial counsel should have requested Bruno's medical records to establish that Bruno had been diagnosed with HHT. *Id* at 30-31. According to Cobb, if trial counsel had determined that Bruno suffered from HHT, this would mean L.C. had a 50% chance of inheriting this genetic disorder, and if L.C. were diagnosed with HHT, then HHT, rather than trauma, could have played a role in L.C.'s injuries. *Id*. at 31.

Respondent argues the OCCA's decision that appellate counsel's performance regarding the omission of this issue was neither deficient nor prejudicial is not an unreasonable application of *Strickland*. Dkt. 20 at 35. Specifically, Respondent argues trial counsel did a thorough investigation by obtaining a court order requiring St. Francis Hospital to produce L.C.'s birth records and Bruno's pregnancy records. *Id*. at 36; Dkt. 21-17 at 100.[11] Respondent contends the failure to test L.C. for HHT and rely on the proposition that L.C. had a 50% chance of HHT, was trial strategy because if HHT were ruled out, Cobb would have had no explanation for L.C.'s injuries. Dkt. 20 at 37.

Attached to Cobb's habeas petition are an obstetrical admission record from Southcrest for Bruno, dated December 8, 2011, with a notation, "HHT," in the portion of the form for obstetrical high risk factors and a clinical visit summary regarding an examination of L.C. at Jimmy Everest Center for Cancer and Blood Disorders on May 19, 2014. Dkt. 2-12; Dkt. 2-13. The clinical visit summary indicates that the reason for L.C.'s visit was to "Rule out HHT," and further indicates, "[L.C.] does not have any evidence of [HHT], based on history and clinical exam. At this time, family history is unclear and there is not significant suspicion to consider CT/MRI scans and genetic analysis." Dkt. 2-13. Despite this clinical visit summary, which was completed before

---

[11] It is unclear whether trial counsel actually obtained these records, as they are not a part of the record before the Court. At trial, however, Cobb's counsel stated "[w]e know in the medical records where the mother has put in the records that she has HHT." Dkt. 21-12 at 65 (652).

trial, trial counsel argued that HHT was a reasonable, alternative explanation for L.C.'s injuries. Cobb's trial counsel cross-examined Dr. Wallace about HHT, its symptoms, and potential risks. Dkt. 21-10 at 77-78 (504-505). Trial counsel also crossed Dr. Boedecker, a neurosurgeon, about HHT. Dkt. 21-11 at 48 (554). Dr. Boedecker testified that if someone is an "easy bleeder," it would not take much trauma to cause SDH. *Id*. Dr. Boedecker also testified that he has not seen SDH caused by coughing, vomiting, or choking. *Id*. at 48. Finally, trial counsel argued in closing argument that Bruno's HHT diagnosis and unknown diagnosis of L.C. constituted reasonable doubt. Dkt. 21-15 at 59 (937) ("Dr. Wallace knew what HHT is and you all know what hemophiliacs are. This HHT is a disease that causes them to bleed easily, much easier than someone else. And to this day they have never tested this child to see whether or not -- done any kind of blood test to see whether this child has HHT which makes it prone to bleeding.").

This record supports that trial counsel's conduct was neither deficient nor prejudicial and thus supports that the OCCA did not unreasonably apply *Strickland* when it determined appellate counsel was not ineffective for omitting this allegation of trial counsel's ineffectiveness. Trial counsel obtained an order from the trial court to obtain Bruno's medical records, cross-examined lay and expert witnesses about HHT, and argued in closing that HHT was a potential alternative explanation for L.C.'s injuries. The jury thus had an opportunity to consider issues related to HHT and whether HHT could have caused L.C.'s injuries. Because trial counsel's performance as to this issue was neither deficient nor prejudicial, the OCCA reasonably rejected Cobb's assertion that appellate counsel should have argued trial counsel's ineffectiveness as to this issue.

### D. FAILURE TO RAISE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL RELATED TO TRIAL COUNSEL'S FAILURE TO CROSS-EXAMINE BRUNO ON HER PSYCHIATRIC DIAGNOSIS

Next, Cobb argues his appellate counsel was ineffective for not arguing that trial counsel failed to cross-examine Bruno about her psychiatric diagnosis. Dkt. 2 at 13-14. Bruno testified at trial that she was on a number of medications that were prescribed to her by her psychiatrist and primary care physician. Dkt. 21-9 at 88 (407). Cobb contends had his trial "counsel investigated and learned the mental condition each of these medications were to treat, then an expert . . . could have testified whether or not [Bruno's] mental disorder negatively affected [Bruno's] credibility, truthfulness, [and] memory." Dkt. 14 at 26. In support, Cobb attaches an affidavit from Dr. Jonathan Lipman, a neuropharmacologist, who lists a number of possible diagnoses that could result in prescriptions for the medications Bruno described and states how these diagnoses could affect a person's truthfulness, sense of reality, and memory. Dkt. 2-18 at 6-8.

Respondent argues the OCCA's decision that appellate counsel was not ineffective for failing to raise this argument is not an unreasonable application of *Strickland* because trial counsel's cross-examination challenged Bruno's credibility and reliability related to her medications and, in closing argument, trial counsel argued these "psychotic medication[s]" made Bruno "one screwed up person . . . [a]nd you shouldn't believe anything about her." Dkt. 20 at 44-45. The record supports Respondent's view that trial counsel cross-examined Bruno about her medications and elicited testimony from her that these medications were prescribed by a psychiatrist, and urged the jury in closing to discredit Bruno's testimony. Dkt. 21-9 at 88-89 (407-08); Dkt. 21-15 at 52 (930). While trial counsel did not elicit Bruno's testimony regarding the exact mental health diagnosis, this appears a trivial distinction from the testimony that Bruno was prescribed multiple psychiatric drugs by her psychiatrist.

Moreover, while Dr. Lipman's affidavit, which speculates[12] on various diagnoses, may have provided some impeachment value, trial counsel adequately explored issues with Bruno's credibility and reliability.  As stated above, trial counsel discussed Ms. Bruno's criminal history, her drug use, her statements in drug court about dishonesty with family and friend, and her suspected drug use while at the hospital.

As stated above, "the manner in which counsel cross-examines a particular witness is a strategic choice and therefore virtually unchallengeable." *Kessler*, 335 F. App'x at 770 (internal quotation marks and citations omitted).  The cross-examination of Bruno regarding her psychiatric diagnosis is within these bounds.  Even if Bruno's particular psychiatric diagnosis should have been elicited, the effect this information would have on the proceedings is inconsequential.  Thus, the Court finds the OCCA's decision that appellate counsel was not ineffective for raising this allegation regarding trial counsel's ineffectiveness is not an unreasonable application of *Strickland*.

### E. FAILURE TO RAISE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL RELATED TO TRIAL COUNSEL'S FAILURE TO RETAIN EXPERT ON THE EFFECTS BRUNO'S MEDICATION AND UNDERLYING DIAGNOSIS

In a similar vein to his previous argument, Cobb argues appellate counsel was ineffective for failing to argue that trial counsel should have retained an expert to testify about the effects of Bruno's medication and underlying diagnosis.  Dkt. 2 at 14.  Cobb contends his trial counsel should have sought a continuance to retain an expert to testify that Bruno's memory, credibility, and truthfulness were impaired by her medications and underlying psychiatric diagnosis.  *Id*. at 14-15.

---

[12] Notably, Dr. Lipman had not been provided Bruno's medical records, but rather was told about the medications she testified she was taking and was asked to speculate on what possible diagnoses could arise from this combination of medications.  Dkt. 2-18 at 4.

Respondent argues the OCCA's determination that appellate counsel's conduct was neither deficient nor prejudicial is not an unreasonable application of *Strickland*. Dkt. 20 at 53. According to Respondent, trial counsel reasonably decided to forego an expert witness on Bruno's psychiatric diagnosis and medications and rely instead on "other tactical tools, including extensive cross-examination of Ms. Bruno." *Id*. The Court agrees. Under the circumstances of this case, the retention of an expert to impeach Bruno about her medications and psychiatric diagnosis would have added little substance to the trial. Again, Bruno's credibility and truthfulness was sufficiently drawn into question through evidence of her criminal history, her drug use, her statements in drug court about dishonesty with family and friend, and her suspected drug use while at the hospital. Thus, the Court finds the OCCA's decision that appellate counsel was not ineffective for failing to raise this sub-claim is not based on an unreasonable application of *Strickland*.

## F. FAILURE TO RAISE *BRADY* VIOLATIONS ON DIRECT APPEAL

In his last complaint about appellate counsel's representation, Cobb argues appellate counsel should have raised two *Brady* claims on direct appeal. Dkt. 2 at 15-16. The first *Brady* claim is related to the prosecution's failure to disclose Bruno's mental illness. Dkt. 14 at 38. The second is related to the prosecution's failure to disclose that Bruno was arrested in Florida. *Id*. at 40.

A *Brady* violation arises from "the suppression by the prosecution of evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. *See also Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006) ("A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused"). To show a *Brady* violation occurred, "[t]he evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009) (quoting *Banks v. Dretke*, 540 U.S. 668, 691 (2004)).  A showing of prejudice requires the suppressed evidence be material so that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

### 1.  BRUNO'S CREDIT CARD FRAUD ARREST

Cobb contends appellate counsel was ineffective for failing to bring a claim related to the prosecution's failure to disclose that Bruno had been arrested in Florida for credit card fraud.  Dkt. 2 at 15-16.  Cobb's habeas counsel focuses on the trial court's determination of this issue, which found the state did not have possession or knowledge of this Florida arrest before trial.  Dkt. 14 at 41.  Cobb contends this finding is an unreasonable determination of the facts and an unreasonable determination of *Brady*, and that "[t]he state breached [its] duty by failing to produce a national criminal history that would have included the Florida arrest."  *Id*. at 42

Respondent argues the OCCA's decision that appellate counsel's conduct in failing to raise a *Brady* claim as to this issue was neither deficient nor prejudicial is not an unreasonable application of *Strickland* because the state was not in possession of this information and was not required to perform a national criminal history search of Bruno.  Dkt. 20 at 63-64.  The Court agrees.  As Cobb acknowledges, the trial court made a factual finding that the state did not possess information about the Florida arrest.  This factual finding is entitled to a presumption of correctness unless Cobb rebuts it with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Cobb's assertion that the trial court's factual determination was unreasonable is argument, not evidence.  Moreover, as Respondent argues, Cobb fails to explain how this evidence, even if it should have

been discovered and disclosed by the prosecution, was material impeachment evidence given that the jury was already aware of her arrest for larceny, multiple felony warrants, and attempted escape from jail. *Id*. at 63 n.32. Because Cobb cannot show a reasonable probability that, had evidence of Bruno's Florida arrest been disclosed to the defense, the outcome of his trial would have been different, the Court finds the OCCA did not unreasonably apply *Strickland* when it found appellate counsel's allegedly deficient performance was not prejudicial.

### 2. BRUNO'S PSYCHIATRIC DIAGNOSIS

Cobb also contends appellate counsel was ineffective for failing to raise a *Brady* claim based on the prosecution's failure to disclose that Bruno had been diagnosed with a mental disorder. Dkt. 14 at 38. Cobb alleges the state knew that Bruno had been diagnosed with a mental disorder because she had been sentenced to mental health court. *Id*. at 39-40. Cobb argues this information was "exculpatory impeachment evidence that should have been disclosed." *Id*. at 40.

Respondent argues that Cobb's *Brady* claim fails, and as a result, so does his ineffective assistance of appellate counsel claim. Dkt. 20 at 57. Specifically, Respondent contends Cobb merely speculates that the state possessed evidence of Bruno's mental disorder and fails to show this evidence, even if it exists, was material within the meaning of *Brady*. *Id*. at 59-61.

The OCCA reviewed this claim in Cobb's post-conviction proceedings and held that appellate counsel's performance in failing to raise this *Brady* claim was neither deficient nor prejudicial. Dkt. 20-10 at 4. Cobb fails to show how the OCCA's decision is objectively unreasonable. Like this Court found above, issues of Bruno's mental health, credibility and truthfulness were sufficiently raised through trial counsel's elicitation of evidence regarding her criminal history, her drug use, statements of dishonesty, and drug use while at the hospital with L.C. Because Cobb cannot show a reasonable probability that, had evidence regarding Bruno's

specific psychiatric diagnosis (or diagnoses) been disclosed to the defense, the outcome of his trial would have been different, the Court finds the OCCA's decision that appellate counsel's conduct was neither deficient nor prejudicial is not based on an unreasonable application of *Strickland*.

## V.   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In claim two, Cobb contends he received ineffective assistance of trial counsel when trial counsel (1) broke his promise to the jury that Cobb would testify, (2) failed to impeach Jannette Collins with a conviction of larceny, (3) failed to review, redact, and preserve a demonstrative, video exhibit,[13] and (4) failed to object to hearsay on the 911 dispatch call.  Dkt. 2 at 17-22.  Cobb raised this ineffective-assistance-of-trial-counsel claim to the OCCA on direct appeal.  Dkt. 20-1 at 26-42.

As previously stated, to prevail on a claim of ineffective assistance of counsel, a prisoner has the burden of showing his counsel was deficient and that such deficient performance was prejudicial.  *Strickland*, 466 U.S. at 688.  A reviewing court's "scrutiny of counsel's performance must be highly deferential," and the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  Even if counsel's performance is shown to be unreasonable under this deferential standard, *Strickland* requires the defendant to show prejudice, *i.e.*, to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

As stated above, § 2254(d)(1) adds a second layer of deference.  When a federal habeas court reviews a state court's decision on a *Strickland* claim, the habeas court must grant the state

---

[13] Cobb has abandoned this claim.  *See* Dkt. 14 at 44 ("*Petitioner elects not to pursue Counsel's failure to object to Re-enactment Demonstrative video and this issue is abandoned for lack of merit.")

court "a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101. The only question for the habeas court is whether the state court had a reasonable basis for rejecting the *Strickland* claim. *Id.* And "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* at 105.

The OCCA found Cobb suffered no prejudice, *i.e.,* there was not a reasonable probability of a different outcome but for trial counsel's allegedly deficient performance. Dkt. 20-4 at 3.

### A. BROKEN PROMISE THAT COBB WOULD TESTIFY

Cobb first contends that, in opening statements, trial counsel stated the jury would hear, through Cobb's testimony, that "L.C. had fallen out of a swing before May 22 while in [Bruno's] care [and that Cobb] came home and personally saw that L.C. was hanging out of an automatic swing with his head dragging back and forth and hitting the floor while [Bruno] sat asleep nearby." Dkt. 14 at 42. Cobb states that after close of the State's case, he changed his mind and decided not to testify. *Id*. at 43. Cobb alleges that his decision to not testify was "never explained by anyone." *Id*. at 42. He argues the OCCA's decision that no prejudice resulted from trial counsel's unfulfilled statement that the jury would hear testimony from Cobb was an unreasonable application of *Strickland*. *Id*.

Respondent argues the OCCA's decision is a reasonable application of *Strickland* because, from the start of trial, Cobb stated he would testify, contrary to the advice of his counsel. Dkt. 20 at 67. It was only after his counsel made the statements about Cobb testifying that Cobb made the decision not to testify. *Id*. In addition, Respondent argues the jury was instructed that it could not consider the fact Cobb did not testify in their deliberations and trial counsel's closing argument

that Cobb's story did not change from first speaking to police further support's the reasonableness

of the OCCA's decision.  *Id*. at 68-69.

While the OCCA rejected the *Strickland* claim solely on its finding that Cobb suffered no

prejudice, the record supports the reasonableness of counsel's performance regarding statements

about Cobb's anticipated testimony.  Cobb's counsel stated in opening:

> my client will tell you that he came home, that Bessie was asleep, not awake, and
> that [L.C.] was in one of these automatic swings and that he had fallen out of the
> swing and it just kept taking him back and forth and my client gets [L.C.] out of
> that, wakes her up, says what in the world are you doing.

Dkt. 21-8 at 48 (295).

At trial, Noel Cobb testified about the swing incident, stating L.C. had fallen out of a swing

about a week prior and was unable to support his neck properly afterwards.  Dkt. 21-14 at 28 (842).

Mr. Cobb testified to the story trial counsel told in opening and stated that L.C. developed some

bruises as a result.  *Id*. at 28-32 (842-46).

In closing, trial counsel argued:

> And, again, what else could the defendant -- had he taken the stand what else could
> he have told you?  He told you all from the very beginning.  His story has not
> changed. From the time the officer got there his story has remained the same.  It
> hasn't changed.  He told the first officer there that was there before they ever left
> to go to the ambulance.  He told the same story as to what happened when he got
> to the hospital to check on his child.  It has never changed one bit.

Dkt. 21-15 at 42 (920-21).

Trial counsel's statement during opening appears to be objectively reasonable, given Cobb

told his counsel he wanted to testify and did not change his decision until after opening statements.

*See e.g.*, *Bell v. Cone*, 535 U.S. 685, 698 (2002) (reiterating that counsel's conduct must be

evaluated from counsel's perspective at the time); *Pray v. Farwell*, 620 F. App'x 561, 564 (9th

Cir. 2015) (unpublished) (finding trial counsel's decision to renege on promise to jury that the

petitioner would testify was well within an objective standard of reasonableness where at the time of opening statements, trial counsel believed the petitioner would testify).

The record further supports the OCCA's decision that Cobb suffered no prejudice. First, the Court finds that Cobb's story of L.C. falling out of the swing was presented to the jury through the testimony of Noel Cobb. As such, the jury was allowed to consider this fact and resolved the factual issue of whether this caused L.C.'s injuries in favor of the state. Second, Dr. Nicole Wallace testified

> Certainly with the rapid pace that the blood was reaccumulating once we were able to observe in the hospital we can say with reasonable certainty that this injury was certainly not weeks old, it was not days old. With that type of bleeding pattern we're talking hours. So whatever happened that ultimately caused him to be near death, not able to breathe on his own and requiring intensive care that injury had happened within hours of his arrival at the hospital.

Dkt. 21-10 at 28-29 (455-56).

This testimony undermines any reasonable probability that the outcome of Cobb's trial would have been different had Cobb testified as trial counsel stated he would at the beginning of trial. Thus, the Court finds that the OCCA's decision that Cobb did not suffer prejudice from his counsel's statements in opening is not based on an unreasonable application of *Strickland*.

## B. FAILURE TO IMPEACH JANNETTE COLLINS WITH LARCENY CONVICTION

Next, Cobb argues trial counsel should have impeached Jannette Collins with evidence that she had a prior conviction of larceny. Dkt. 14 at 36. At trial, Collins testified that Cobb said "Oh, my God, I've killed my son" several times. *Id*.; Dkt. 21-9 at 1 (320). Cobb concedes in his reply that trial counsel's allegedly deficient performance on this point, "standing alone" was not sufficiently prejudicial. Dkt. 28 at 68. He argues, "[h]owever, the prejudice from this error should be considered cumulatively with other [sic] errors of counsel." Dkt. 28 at 68. Because Cobb

concedes this alleged error was not prejudicial and does not suggest that the OCCA failed to consider the cumulative effect of all errors by trial counsel when the OCCA found Cobb failed to show the requisite prejudice, Cobb also fails to show that the OCCA's decision is based on an unreasonable application of *Strickland*.

### C.  FAILURE TO REDACT HEARSAY FROM 911 DISPATCH CALL

In his final complaint about trial counsel, Cobb contends trial counsel should have requested redaction of the 911 dispatch call, wherein the dispatcher stated, "they need you to come up there because that baby's been abused."  Dkt. 2 at 22.[14]  The evidence presented at trial, primarily through testimony of L.C.'s treating doctors, showed that L.C.'s injuries occurred by abuse and/or trauma.  Dkt. 21-10 at 32 (459) ("[Dr. Wallace's conclusion is] [t]hat L.C. is the victim of abusive head trauma.").  Had trial counsel objected to the admission of the unredacted 911 dispatch call, and had the trial court granted that objection, admission of the redacted call would not have overcome this compelling evidence that L.C.'s injuries resulted from abuse or created a reasonable probability of a different outcome.  Because Cobb cannot show prejudice, the Court finds the OCCA's decision that Cobb did not suffer prejudice is not an unreasonable application of *Strickland*.

### VI.  CUMULATIVE ERROR

In claim three, Cobb argues the cumulative errors cited throughout his petition deprived him of a fair trial.  Dkt. 2 at 23.  Cobb contends that these errors, in the aggregate, resulted "in a verdict not worthy of confidence."  Dkt. 14 at 45-46.

---

[14] While Cobb raises this claim in his habeas petition, his habeas counsel does not address this claim is his supporting brief or reply.  Respondent does not address this issue either.  It is unclear to the Court whether Cobb intended to abandon this claim like he did with his demonstrative aid claim.  Therefore, the Court will address the merits of this claim.

Respondent argues that this claim is procedurally barred because Cobb did not raise this claim on direct appeal or in his post-conviction proceeding.  Dkt. 20 at 74-75.[15]  Even if the Court considered the merits, Respondent argues there are no errors to accumulate, as the OCCA's adjudication of claims one and two did not result in a decision that is based on an unreasonable application of *Strickland*.  *Id*. at 77.

The Court agrees.  "[I]n the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."  *Alverson v. Workman*, 595 F.3d 1142, 1162 (10th Cir. 2010) (brackets and internal quotation marks omitted) (quoting *Brown v. Sirmons*, 515 F.3d 1072, 1097 (10th Cir. 2008)).  But a cumulative-error analysis is warranted "only if there are at least two errors."  *Lott v. Trammell*, 705 F.3d 1167, 1223 (10th Cir. 2013) (quoting *Hooks v. Workman*, 689 F.3d 1148, 1194-95 (10th Cir. 2012)).  In analyzing the claims raised by Cobb, the Court found no constitutional errors.  The Court therefore finds no basis to perform a cumulative-error analysis.

## VII.   CONCLUSION

Based on the foregoing analysis, the Court concludes that § 2254(d) bars relief as to claims one and two, that claim three is procedurally barred, and, that claim three alternatively fails on the merits.  For these reasons, the Court denies the petition as to all claims asserted therein.

## VIII.   CERTIFICATE OF APPEALABILITY

Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*, requires "[t]he district court [to] . . . issue or deny a certificate of appealability when it enters a final order

---

[15] The Court finds this claim can be addressed under 28 U.S.C. § 2254(b)(2) without reaching a determination as to exhaustion.

adverse to the applicant."   A certificate may only issue "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   When the district court rejects a petitioner's constitutional claims on the merits, the petitioner must make this showing by "demonstrat[ing] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   Because Cobb has not made this showing as to any of his claims, the Court denies a certificate of appealability.

        **ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall note the substitution of Angela Hearrell in place of Jimmy Martin as party Respondent.

2. Cobb's request for an evidentiary hearing is DENIED.

3. The Petition for Writ of Habeas Corpus (Dkt. 2) is DENIED.

4. A certificate of appealability is DENIED.

5. A separate judgment shall be entered in this matter.

        DATED this 29th day of September 2022.

Ronald A. White
United States District Judge
Eastern District of Oklahoma